**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| JAMES FRANKLIN KYKER, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| vs. | ) | NO.  CIV-05-0508-HE |
| | ) | |
| THE CITY OF OKLAHOMA CITY, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

Plaintiffs, the former spouse and children of James Kyker, initially filed this action on November 19, 2002, in state district court against the City of Oklahoma City and John Doe officers, asserting claims under 42 U.S.C. § 1983 and state law.[1] The lawsuit is based on Oklahoma City police officers' alleged assault and shooting of James Kyker ("Kyker") on November 20, 2000.  The City removed the case to federal court and sought its dismissal for untimely service and as a sanction for the dilatory conduct of plaintiffs' counsel.  While the court concluded dismissal of the entire case was not warranted under Fed.R.Civ.P. 41(b) for failure to prosecute, it dismissed the plaintiffs' claims against the unidentified John Doe police officers named in the petition as well as the plaintiffs' state law and punitive damages claims.[2]  Order, July 26, 2005.  The remaining claim consists of the City's alleged violation

---

[1]*James Kyker died on August 6, 2004. As Tabatha Kyker has been appointed the administrator of her father's estate, she may pursue the claim asserted here on his behalf. See Fed.R.Civ.P. 17(a).*

[2]*Although plaintiffs' counsel announced during Tammy Raynor/Kyker's deposition that Tammy and her children were no longer pursuing their false arrest and imprisonment claims, Raynor depo. pp . 120-21, the court had already dismissed them.*

of James Kyker's Fourth and Fourteenth Amendment rights based on the officers' asserted use of excessive force.[3]  The plaintiffs contend the City's policy on deadly force is unconstitutional and the City failed to properly train and supervise its police officers regarding the use of force.

The City has filed a motion for summary judgment, which is appropriate only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  The court has viewed the evidence and any reasonable inferences that might be drawn from it in the light most favorable to the plaintiff, the nonmoving party.  Davidson v. America Online, Inc., 337 F.3d 1179, 1182 (10th Cir 2003).  Having applied the Rule 56 standard to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law," Jeffries v. Kansas, 147 F.3d 1220, 1228 (10th Cir.1998) (internal quotation and citation omitted), the court concludes the defendant's motion should be granted.  The pertinent facts and explanation for the court's decision follow.

---

[3]*As noted by the court in its July 26, 2005, Order, the claim is analyzed under the Fourth Amendment's reasonableness standard rather than the substantive due process approach.  See Jiron v. City of Lakewood, 392 F.3d 410, 414 (10th Cir. 2004).*

## BACKGROUND

In 2000, plaintiff Tammy Kyker[4] was having marital problems with her spouse, James Kyker. They had separated and, on August 28, 2000, she sought and obtained a temporary protective order for herself and her children from James.[5] Kyker immediately violated both the temporary protective order and the permanent protective order ("VPO") subsequently entered, by calling Tammy Kyker and showing up at her residence. He was arrested several times and eventually plead guilty on November 9, 2000, to violating the VPO.[6] Kyker was sentenced to two one-year terms of confinement. Both sentences were suspended..

During the next several days Tammy Kyker reported to an Oklahoma City police detective that Kyker was seen at her place of employment, that someone had been in her house, that Kyker had called her and threatened to kill himself if she did not talk to him and

---

[4]*The divorce decree allowed Tammy Kyker to take back her maiden name of Raynor. For purposes of this lawsuit, however, she will be referred to as Tammy Kyker.*

[5]*In her petition for the protective order, Tammy Kyker stated that James Kyker had phoned her repeatedly while she was visiting her father at his home, stating that he would kill himself if she left him. Kyker then appeared at her father's house and, when she came to the door, attempted to cut his wrists and then threw the knife at her face. She stated in the petition that Kyker then left and returned to their house where he slashed the bed. She also stated that he had occasionally been physically abusive to their children that summer and, when in the crisis center, had told his doctor he wanted to kill her. Defendant's Deposition Exhibit 4.*

[6]*Based on statements made by Kyker, including that he was suicidal, had previously attempted suicide and "I'm going to keep fucking with me until you pull out your gun and shoot me in the fucking head," one of the officers who arrested Kyker for violating the VPO noted in his crime report dated September 1, 2000, that "it is the professional opinion of this law enforcement officer that AR possesses a deadly threat to the plaintiff listed in the VPO. I also believe that because of AR's suicidal attempts he may cause law enforcement officers to use deadly force in dealing with him." Defendant's Deposition Exhibit 7.*

that she had eventually called the Del City police, who had taken Kyker to the Crisis Center. On November 16, 2000, someone called the police from Tammy Kyker's home, reporting that Kyker was there and was holding a knife to his chest. An Oklahoma City policeman was dispatched to the scene. He placed Kyker in custody and took him to the Crisis Center. Kyker was released from there on November 20, 2000, and appeared that afternoon at Tammy Kyker's house. A daughter subsequently took him to his grandmother's house where he was living. Later that same evening around midnight, Tammy Kyker returned to her home and saw Kyker inside. She called the police and, as she was sitting in her vehicle, Kyker came out armed with a knife. He threatened to kill himself if she did not go back with him. He tried to open her car door and she sprayed him with Mace and left.

Tammy Kyker returned a few minutes later with her son Scott. As they pulled into the driveway they saw Kyker with another, larger knife. About that time two Oklahoma City police officers, Officers Walsh and Swanson, arrived and exited their vehicles.[7] Kyker started walking towards them, holding the knife to his wrist and yelling "come get me, shoot me." The officers told Kyker to stop and to drop the knife. Kyker did not comply with their order, but continued to approach the officers. As Kyker came closer both policemen fired their guns,[8] shooting Kyker, who fell to his knees.[9] The officers continued to shoot until

---

[7]*The officers had been advised by the dispatcher that Kyker had a knife and was threatening to kill himself. Plaintiffs' Exhibit 7; Defendant's Exhibit 30. A third officer, Sergeant Parker, arrived after Walsh and Swanson. She did not fire her weapon.*

[8]*The distance between Kyker and Officer Swanson at the time the officers discharged their weapons is disputed, and varies from 6-7 feet to 14 feet. Compare Defendant's depo.*

Kyker dropped the knife. Officer Swanson fired four shots. Officer Walsh fired his gun eleven times.[10] Kyker survived the shooting, dying approximately four years later. The plaintiffs claim his death resulted from the injuries he sustained on November 20, 2000.

Defendant Oklahoma City trained its officers, including Officers Swanson and Walsh, to use deadly force to stop a threat, not to kill, and only when "necessary to defend themselves or another from eminent harm, either serious bodily injury or death."[11] Defendant's brief, p. 4, ¶5;[12] defendant's Exhibit 1. Officers were taught that once the threat is eliminated the force needs to stop.[13] Defendant's brief, p. 4, ¶5. The Oklahoma City

---

*Exhibit 37 and plaintiffs' Exhibit 4, p. 110 with plaintiffs' Exhibit 1, p. 7.*

[9]*Both Swanson and Walsh reported that they discharged their weapons when Kyker dropped his hands to his waist and then lunged or made an aggressive move towards Swanson. Defendant's Exhibit 30; Plaintiffs' Exhibit 7. The plaintiffs dispute the City's assertion that Kyker was "waiving the knife in the air," defendant's brief, p. 9, ¶ 23, claiming instead that he was holding the knife to his wrist. However, the evidence they cite to support their position, plaintiffs' Exhibit 7 (an Office of Internal Affair's Memorandum regarding the incident), states "When James Kyker noticed the officers arrival, he approached the officers and continued to make suicidal threats. At one point James Kyker lunged with the knife towards Officer Swanson."*

[10]*It is undisputed that the officers fired only one volley of shots.*

[11]*The Oklahoma City Police Department Operations Manual provided that "no officer will use more force in any situation than is reasonable and necessary under the existing circumstances" and that "[o]fficers are required by law to use only the <u>minimum</u> amount of force necessary to protect themselves and other persons ...." Defendant's Exhibit 6.*

[12]*The plaintiffs did not effectively controvert the defendant's statements regarding its training on deadly force. See defendant's brief, p. 4, ¶5; plaintiffs' response, p.5 ¶4.*

[13]Officer Swanson and Officer Walsh received training at the Oklahoma City Police Department Training Academy, were provided in-field training from a veteran police officer and annual in-service training. Both testified they were trained to continue to use deadly

5

Police Department Operations Manual specifies that "no officer will use more force in any situation than is reasonable and necessary under the existing circumstances." Defendant's Exhibit 6. Some instruction also was given on interactions with mentally ill and suicidal suspects.[14]

## DISCUSSION

The plaintiffs' claims are based on the officers' alleged excessive use of deadly force. While they challenge the City's deadly force policy to the extent it is "couched in predominantly subjective standards with little or not objective criteria," plaintiffs' response, p. 4, they focus on the asserted lack of training, rather than the City's policies, in their brief. In fact, the plaintiffs state that they "do not dispute the content of Defendant City's written policy on the use of deadly force, but deny that the instruction and training on same is adequate."[15] Plaintiffs' response, p. 5 ¶4. In light of this statement and the absence of any evidence creating a fact question as to the constitutionality of the City's written policies, *see* Carr v. Castle, 337 F.3d 1221, 1228 (10th Cir. 2003), summary judgment is warranted in the

---

force until the threat is gone. Defendant's reply brief, Swanson depo., p. 97; Walsh depo., pp .95-96.

[14]*While the plaintiffs dispute that the mental health instruction the City officers received was sufficient, they failed to offer any evidence demonstrating its inadequacies. See plaintiffs' response pp. 4-5, ¶¶3,4.*

[15]*This statement conflicts with other, unsubstantiated statements such as "[b]ecause myriad questions of fact underlie the Constitutionality of Defendant City's policies ...." Plaintiffs' response, p. 1. The plaintiffs' expert does not criticize the City's policies in his report, but rather asserts that the City's training and supervision of its police officers was inadequate. Plaintiff's Exhibit 1.*

defendant's favor to the extent the plaintiffs' claim is based on City policies.

The plaintiffs' failure to train claim hinges on the number of shots fired and the officers' continued firing after Kyker fell to his knees. They contend that the City failed to train its officers regarding the excessive use of deadly force and on how to respond to armed, mentally ill suspects. To prevail on this claim the plaintiffs "must first prove the training was in fact inadequate." *Id.* at 1228 (internal quotations omitted).[16] They then must satisfy the following requirements:

> (1) the officers exceeded constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute a usual and recurring situations with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the party of the city toward persons with whom the police officers come into contact, and (4) there is a direct causal link between the constitutional deprivation and the inadequate training.

*Id.*

Inadequate training

As evidence of the City's alleged inadequate training on the use of deadly force, the plaintiffs cite Officer Swanson's testimony that there are no "varying degrees" of deadly force. They contend that the City failed to instruct its officers on the minimum use of deadly force and, consequently, Officers Swanson and Walsh "believed it justified to shoot James Kyker with unyielding fury ... without regard to whether some lesser number of gun shots

---

[16]*The requirement that the plaintiff initially demonstrate inadequate training was not explicitly required by the Tenth Circuit in earlier cases considering a municipality's liability under § 1983 for inadequate police training in the use of force. Compare <u>Allen v. Muskogee</u>, 119 F.3d 837, 841-42 (10th Cir. 1997) and <u>Myers v. Oklahoma County Bd. of County Comm'rs</u>, 151 F.3d 1313, 1318 (10th Cir. 1998) with <u>Carr</u>, 337 F.3d at 1228.*

would have likewise effected the arrest, achieving the same result but inflicting far less injury." Plaintiffs' response, p. 12.  The lack of training is shown, the plaintiffs assert, by both the number of shots fired and the continued shooting after Kyker was no longer standing.  The plaintiffs also maintain that the City's officers were not trained properly in dealing with armed, suicidal persons.

"[A] single incident of excessive force can establish the existence of an inadequate training program if there is some other evidence of the program's inadequacy."  Brown v. Gray, 227 F.3d 1278, 1286 (10th Cir. 2000).  Here, the undisputed facts are that the officers shot an armed man who was advancing on them, despite being warned to stop and to drop his weapon.  Although they continued to fire when Kyker had fallen to his knees, only one volley of shots was fired and the officers ceased shooting when he dropped the knife.  The court doubts these facts, even when viewed in the light most favorable to the plaintiffs, demonstrate the use of excessive force.  See Medina v. Cram, 252 F.3d 1124 (10th Cir. 2001); Gross v. Pirtle, 245 F.3d 1151, 1158 (10th Cir. 2001) ("The reasonableness of an officer's conduct must be assessed 'from the perspective of a reasonable officer on the scene,' recognizing the fact that the officer may be 'forced to make split-second judgments' under stressful and dangerous conditions.") (quoting Graham v. Connor, 490 U.S. 386, 396-97 (1989)).  Assuming, however, a triable fact question exists as to whether the officers used excessive force in their encounter with Kyker, the plaintiffs' "other evidence of the program's inadequacy" is barely enough to create a jury question as to the sufficiency of the officers' training.  The additional evidence proffered by the plaintiffs consists of expert

8

testimony and two prior police shooting incidents.

The plaintiffs' expert, William T. Gaut, finds numerous deficiencies in the officers' conduct and training , but several are based on facts not in the record or on misstated facts. He faults the information relayed by the dispatcher, but the plaintiffs' claims are based on the officers' conduct, not other police personnel.[17] He also cites the failure of the senior officer on the scene to inform Officers Swanson and Walsh of the prior protective order violations, stating that if the officers had possessed that information "their actions may have been markedly different," but does not specify how their behavior would have changed. Plaintiffs' Exhibit 1, p. 4. The expert criticizes the officers for failing to use reasonable means, other than verbal commands, prior to using deadly force, but does not explain what they should or could have done in that situation.[18] *See* Medina, 252 F.3d at 1133 ("If we were to follow the dissent's approach and consider the expert's assertions regarding the failure to use pepper spray and other tactical measures, we would be evaluating the officers'

---

[17]*Nothing in the record demonstrates either the extent of the information relayed by the dispatcher or that the dispatcher's failure to advise the officers of the fact that Kyker had been sprayed with paper spray, as the expert claims she/he should have, was anything more than negligence. Simple negligence is not actionable under § 1983. See* Murrell v. School Dist. No. 1., *186 F.3d 1238, 1250 (10th Cir. 1999) (§ 1983 sexual harassment claim). The expert also critiques the investigative procedures used after the shooting, which are of minimal, if any, relevance to the issue of whether the City adequately trained its officers.*

[18]*The expert also points to Officer Swanson's apparent lack of understanding of "the application of the use of force policy where a suspect is at a distance of twenty one (21) feet from the officer and the officer has his service weapon directed at the suspect ...." Plaintiffs' response, p. 5; Plaintiffs' Exhibit 1, pp. 5-6. However, the plaintiffs' own expert estimated that Kyker was within 14, not 21, feet of Officer Swanson when Officer Walsh started firing.*

conduct from the 20/20 perspective of hindsight rather than from the perspective of an officer making split-second judgments on the scene."). He also opines that the officers improperly "abandoned their cover and advanced toward Mr. Kyker with firearms drawn ... intentionally plac[ing] themselves in a 'zone of danger.'" Plaintiffs' Exhibit 1, p. 5. However, the record does not indicate the officers were ever stationary behind the doors of their vehicles. It also does not support Gaut's assertion that the officers <u>approached</u> Kyker with weapons in hand. The factual scenario here was in sharp contrast to that in <u>Allen v. Muskogee</u>, 119 F.3d 837 (10th Cir. 1997), where officers approached an armed suicidal person who was in a vehicle and attempted to disarm him.[19]

Despite its various flaws, Gaut's opinion cannot be totally discounted, however, as he does testify that standard police practice is to train its officers to "double tap" or shoot in sequences of two shots to prevent "overshooting." Although he acknowledges that Oklahoma City police officers are trained in this technique, he opines that the training was evidently inadequate, based on the eleven continuous shots fired by Officer Walsh and his continued shooting after Kyker was on his knees and, arguably, no longer a threat. The court concludes Gaut's opinion constitutes the required "other evidence of the program's inadequacy" insofar as the plaintiffs' § 1983 failure to train claim is premised on the use of

---

[19]*Gaut's opinions are also questionable in other respects. For example, he states that "there was no reason that Sergeant Parker could not have issued a 'hold your fire' order once Mr. Kyker had fallen from his wounds," plaintiffs' Exhibit 1, p. 8, yet the record does not reflect how close she was to Officers Walsh and Swanson, whether she could have reacted quickly enough to issue a command, whether, if issued, it would even have been heard, etc.*

excessive force.[20]

To the extent the plaintiffs' claim is based on a lack of training in the handling of suicidal or mentally disturbed persons, it fails. The plaintiffs' expert does not address this issue and the plaintiffs have not submitted other persuasive evidence of the inadequacy of the City's police training as it relates to dealing with armed, emotionally unstable persons.[21]

Constitutional Violation and Usual and Recurring Situation

As the plaintiffs have offered some evidence of inadequate training, the court will proceed to consider the remaining four requirements of their § 1983 claim. The first is satisfied.[22] As noted previously in conjunction with the inadequate training aspect of the plaintiffs' claim, the combined evidence of the number of shots fired and the continued firing after Kyker was no longer standing provides some evidentiary support for the contention that

---

[20]*For reasons discussed subsequently, the plaintiffs' evidence of two other shooting incidents would not amount to the required "other evidence."*

[21]*Even if the plaintiffs' claim based on a lack of training on dealing with mentally ill or emotionally disturbed people made it over the first evidentiary hurdle, it would not be sufficient to create a fact issue as to the four requirements needed to prevail against the municipality under § 1983. The plaintiffs have not submitted sufficient ( if any) evidence of the City's deliberate indifference towards suicidal or mentally ill persons with whom its officers come into contact, or evidence of a causal link between that alleged constitutional deprivation and inadequate training. There is no proof that, if Officers Swanson or Welch had received additional or "proper" training in the handling of a suicidal or mentally ill person, they would, or even should, have reacted differently in the particular circumstances with which they were confronted. Cf. Brown, 227 F.3d at 1285-89.*

[22]*The court recognizes that the plaintiffs' burden in the summary judgment context is "only that of creating reasonable inferences, not one of proof as such," Carr, 337 F.3d at 1228 n.9, but, like the Tenth Circuit, uses "establish," "prove," "show," "satisfy," or similar terms for ease of locution.*

the officers exceeded constitutional limitations on the use of force. The second requirement — that it is not uncommon for officers to encounter mentally ill persons and individuals armed with deadly weapons – was not disputed by the defendant.

Deliberate Indifference

"The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." Carr, 337 F.3d at 1229. That requirement is not met here, as the record does not support "an inference that the training demonstrates a deliberate indifference on the part of the City toward people with whom the police come into contact." Allen, 119 F.3d at 842.

As evidence that the City had notice that its training on the use of deadly force was constitutionally defective, the plaintiffs cite an incident involving a mentally ill suspect, James Howard, who, on April 12, 1999, was shot six times and killed. They also rely on another shooting death, that of John Randell, at a Denny's restaurant on November 16, 1996. Several police officers had met at Denny's for breakfast and one recognized Randell as a suspect in an earlier shooting. He approached Randell in the restaurant and, when Randell began to point a semi-automatic pistol at him, four officers discharged their weapons 45 times at a distance of 6-10 feet. The plaintiffs contend that if the City's policy is that officers should only use as much force as is necessary to abate the threat, then these cases show that the policy is defective and the City is or should be aware that its training on the use of deadly force is inadequate.

The plaintiffs rely merely on the number of shots fired at Howard and Randell to show that the force used was excessive. They only offer memorandums to the police chief and standard police reports regarding both shootings, plus the medical examiners report from the Howard incident (Plaintiffs' Exhibits 16-20), and ask the court to conclude from these documents that the force used was excessive.[23]

While the court is not persuaded on the basis of the record before it that either incident constitutes a display of excessive force by the police,[24] it will assume, for purposes of the defendant's motion, that the Randell shooting demonstrates a previous incident of an unconstitutional use of force. One prior shooting does not, though, establish a "pattern of misconduct" sufficient to put the city on notice that its training program is inadequate. *See* Carr, 337 F.3d at 1229 ("In most instances, notice can be established by proving the existence of a pattern of tortious conduct."). *See generally* City of Canton v. Harris, 489 U.S. 378, 390 n.10 (1989) ("It could also be that the police, in exercising their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers, who, nevertheless, are 'deliberately indifferent' to the

---

[23]*While the number of shots fired at Randall, if considered alone, might lead to that conclusion, the shooting cannot be considered out of the context in which it occurred.*

[24]*In both cases the district attorney concluded, after a review of the incidents, that the deadly force used was justified under state and federal law and was legal. Defendant's Exhibits 31, 32. The City's procedure of investigating and reviewing incidents in which more force than routine handcuffing is used, see defendant's Exhibit 33, combined with the district attorneys' findings in police-involved shootings between 1996-2000, defendant's Exhibits 31, 32, while not determinative of the issue, support the conclusion that City policymakers were not deliberately indifferent to the need for more or different training.*

need.") (dicta). While a pattern of unconstitutional behavior is not required to provide notice, Allen, 119 F.3d at 842, here there is a lack of evidence that "the need for more or different training [was] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." Id. (quoting City of Canton, 489 U.S. at 390).

Comparing this case with those in which courts have found evidence of deliberate indifference demonstrates the inadequacy of the plaintiffs' proof. For example, expert testimony in Brown established that the City's decision not to train its officers in how to proceed when taking police action while off-shift, when they would be without their radios, uniforms and marked police cruisers, "present[ed] serious safety risks, to officers and to the public ...." Brown, 227 F.3d at 1290. A police captain, who was a twenty-nine year veteran of the department, a former commander of the police academy and was treated by the parties as a policymaker, testified that the city's always armed/always on duty policy was risky. He admitted that the department had "'lost a number of officers this way, although we've had quite a number of successful arrests' ... but insisted that no further training was necessary for its implementation." Brown, 227 F.3d at 1289. Here, "[u]nlike the situation in Brown, in which a policy maker described a conscious training choice that on-and-off-shift police situations should be handled identically, [the plaintiffs] provide[d] no evidence that the City made such deliberate choices regarding any training." Carr, 337 F.3d at 1229.

Similarly, in Allen, the "evidence support[ed] an inference that the City trained its officers to leave cover and approach armed suicidal persons to try to disarm them," Allen,

14

119 F.3d at 843, a tactic which the plaintiff's expert testified was considered to be inappropriate by "all authorities on police tactics and procedures, in both the law enforcement and expert witness communities." *Id.* at 842. The expert in that case also opined that "if the officers were trained to respond to this kind of call by staying in the open, leaving innocent people in the open, and doing provocative things like trying to grab the gun and get into the car, the training was 'out of synch with the entire United States in terms of what police are being trained to do.'" *Id.* at 843. *See* Carr, 337 F.3d at 1229-30 (distinguishing Allen on the basis that Allen "identified (and then dealt with) specific training" that differed from that taught elsewhere in the country, while "Carr (and his experts) rely on the absence of specific training for the Officers that assertedly could have helped them during the encounter ... merely demonstrat[ing] the omniscience of hindsight, rather than satisfying the demands of City of Canton and hence Brown.") (internal citation omitted)

The plaintiffs' proof of deliberate indifference in this case more closely approximates that presented in Carr where "despite Carr's scattershot recital of alleged inadequacies, [the plaintiffs] fail[ed] to provide evidence of how the City had notice that its actions (or failures to act) were likely to result in constitutional violations" or " illustrate[] how the City consciously chose to disregard the risk of harm." Carr, 337 F.3d at 1229. Here, as in Carr, the plaintiffs list numerous ways in which they contend the officers were inadequately trained, " but without proffering any evidence of knowledge of the purported deficiencies on the part of the City" and without showing "that the need for training was obvious to the City

15

in the City of Canton sense." *Id.*

Because of the lack of "evidence placing the City on actual or constructive notice that the asserted failures to train were substantially certain to result in a constitutional violation," *id.* at 1230, the deliberate indifference element requirement is not met. This component of the plaintiffs' claim is not shown by their expert's opinion "that seeks to target the City because the Officers continued to discharge their firearms after the threat had stopped-a deviation from professional and generally accepted police standards and practices. On that score City of Canton, 489 U.S. at 391, 109 S.Ct. 1197 provides the answer: 'And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.'" Carr, 337 F.3d at 1230-31.

Direct Causal Link

The final requirement of a § 1983 claim against a municipality based on a failure to train on the use of force is a causal connection between the training and the alleged constitutional violation. Brown, 227 F.3d at 1290. The plaintiffs have not met their burden on this element either, as the officers "were not trained by the City to shoot [Kyker] repeatedly ... after he no longer posed a threat." Carr, 337 F.3d at 1232.

The plaintiffs have failed to present sufficient evidence to allow their § 1983 failure to train claim to be submitted to a jury. Accordingly, the defendant's motion [Doc. #47] is **GRANTED** and summary judgment is granted in the City's favor on the plaintiffs' § 1983

claim.[25]

**IT IS SO ORDERED**.

Dated this 14th day of November, 2006.

_(signature)_
JOE HEATON
UNITED STATES DISTRICT JUDGE

---

[25] *This ruling moots the defendant's motion to strike the plaintiffs' expert witness reports [Doc. #69].*